


# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5993 | **DATE** | 5/4/2001 |
| **CASE TITLE** | Int'l Union of Operating Engineers, Local 150, AFL-CIO vs. Village of Orland Park, et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Cook County Forest Preserve's motion to dismiss as a defendant [19-2] is denied. Defendant Forest Preserve's motion for summary judgment [19-1] is granted in part and denied in part. Defendants Orland Park's and the Police Department's joint motion for summary judgment [22-1] is denied. Final judgment is entered on liability in favor of the plaintiff Local 150 and against the defendants.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Document Number** |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | 5/7/01 | | |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | C.S. | | 35 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |

ED-7
FILED FOR DOCKETING
01 MAY -4 PM 2: 51

RO — courtroom deputy's initials

Date/time received in central Clerk's Office — mailing deputy initials

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

INTERNATIONAL UNION OF OPERATING )
ENGINEERS, LOCAL 150, AFL-CIO, )
                          )
       Plaintiff, )
                          )    **No. 00 C 5993**
     v. )
                          )    **Judge Ruben Castillo**
VILLAGE OF ORLAND PARK, VILLAGE OF )
ORLAND PARK POLICE DEPARTMENT and )
the COOK COUNTY FOREST PRESERVE )
DISTRICT, )
                          )
       Defendants. )

## MEMORANDUM OPINION AND ORDER

It would be easy to minimize the significance of this case by disclosing that a central part

of this dispute involves an inflatable rat figure. Yet, this case involves important principles of

labor picketing which are protected by the First Amendment right to free speech and assembly.

Plaintiff, International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150") filed

this lawsuit pursuant to 42 U.S.C § 1983, for alleged violations of its constitutional rights under

the First Amendment to the United States Constitution and its statutory rights under § 7 of the

National Labor Relations Act, 29 U.S.C. § 157. Currently before this Court are Defendants',

Village of Orland Park ("Orland Park"), Village of Orland Park Police Department ("Police

Department") and the Cook County Forest Preserve District ("Forest Preserve"), motions for

summary judgment and the Forest Preserve's motion to dismiss.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). For the

following reasons, we deny Orland Park's and the Police Department's joint motion for summary

judgment, (R. 22-1), grant in part and deny in part the Forest Preserve's motion for summary judgment, (R. 19-1), and deny the Forest Preserve's motion to dismiss, (R. 19-2). We also grant partial summary judgment to Local 150 and grant its motion for a preliminary injunction against Defendants, (R. 15-1), to the extent indicated herein.

## RELEVANT FACTS

Most of the facts in this case are undisputed. To the extent that the parties disagree about the facts, we will explain the nature of the disagreement.

Local 150 became involved in a labor dispute with Crystal Tree Golf and Country Club ("Crystal Tree") following a September 2000 election in which Crystal Tree's groundskeepers apparently elected Local 150 as their exclusive representative. Crystal Tree's main entrance is on the south side of 143rd Street in Orland Park. Property owned by the Forest Preserve is on the north side of 143rd Street. Both Orland Park and the Forest Preserve are governmental entities proscribed from infringing upon individual rights guaranteed by the United States Constitution as applied to the states through the Fourteenth Amendment.

On September 22, 2000, Local 150 began to lawfully picket Crystal Tree. As part of its efforts, Local 150's members temporarily staked a large, inflatable rat in the ground on the north side of 143rd Street. In addition, union members placed signs in the ground and parked their cars on the same strip of Forest Preserve property. The picketers, some of whom were dressed in rat costumes, carried signs and drove a "ratmobile" up and down 143rd Street. At the end of each day of picketing, union members removed the signs, the inflatable rat and their cars.

The strip of Forest Preserve property that Local 150 had been using is a grassy area that has no sidewalks, driveways or parking lots. On September 27, 2000, the Forest Preserve told

2

Local 150 that it would have to move the signs, the inflatable rat and their cars because Forest Preserve regulations prohibited such activity, and Local 150 did not have the requisite permits enabling it to use Forest Preserve property. Local 150 complied and moved the signs and the rat to the south side of 143rd Street, which is Orland Park property. Although the Forest Preserve recommended that Local 150 park its cars in a Forest Preserve parking lot several blocks away, Local 150 moved its vehicles to 108th Street in Orland Park, where it had previously been permitted to park a small number of cars. The picketing continued on public property in front of Crystal Tree's main entrance.

Subsequently, Local 150 submitted a pre-printed application form to the Forest Preserve for a special activity permit. Local 150's application was denied by the Forest Preserve Superintendent of Recreation, who has sole discretion to grant or deny permit applications. The superintendent's reasons for denying the permit were that the requested area was not one for which a permit could issue and Local 150's activities would create safety and environmental problems. The Forest Preserve also determined that, because the Illinois Department of Transportation ("IDOT") has an easement on the Forest Preserve property, Local 150 needed permission from IDOT before the Forest Preserve could grant a permit. Local 150 did not seek permission from IDOT but, instead, continued to picket on the Orland Park side of 143rd Street.

Also on September 27, 2000, the Police Department notified Local 150 that its inflatable rat violated Orland Park's sign ordinance and could not be re-erected the following day. When the rat was blown up and staked in the ground on September 28, 2000, the Police Department confiscated the rat and issued a citation to Local 150 for violating Orland Park's sign ordinance. The Police Department also ordered Local 150 to remove its cars from 108th Street, claiming

3

that the increased number of cars created a safety hazard. Local 150 removed its cars. The Police Department returned the rat to Local 150 after the union agreed that it would not use the rat during its picketing activities. All picketing stopped on or about October 22, 2000, following an agreement between Local 150 and Crystal Tree to cease picketing until a new election was held in December 2000.

Presently before the Court are Local 150's motions for summary judgment and for a preliminary injunction and damages. Local 150 alleges that the Forest Preserve's special activity permit procedure is an unlawful prior restraint on First Amendment rights of free speech because it allows a Forest Preserve official unfettered discretion to deny or approve a permit application. Local 150 also contends that Orland Park's sign ordinance is an invalid time, place or manner regulation that violates Local 150's constitutional rights of free speech and its statutory rights under the National Labor Relations Act. Moreover, Local 150 asserts that Orland Park's sign ordinance has been applied in a discriminatory fashion because the Police Department has enforced the ordinance only two times since Orland Park's Public Works Department was charged with enforcing the regulation, and both times union activities were involved.

Also before the Court are Defendants' motion for summary judgment and the Forest Preserve's motion to dismiss. Defendants claim that their ordinances are valid time, place or manner regulations. Orland Park and the Police Department contend that they apply Orland Park's sign ordinance in a non-discriminatory manner. The Forest Preserve argues that its permit procedure is legal.

## LEGAL BACKGROUND

There are three ordinances at issue in this case. Two are Forest Preserve regulations. The

third is an Orland Park ordinance. The Forest Preserve's permit procedure is also at issue.

The Forest Preserve regulations restrict driving and the placing of signs on Forest Preserve property as follows:

> It shall be unlawful for the operator of any automobile . . . to drive
> . . . through any woodland or upon any walk, sidewalk, path or trail
> . . . within the property of the Forest Preserve Forest Preserve . . .
> except in the manner and according to the regulations prescribed
> by the Forest Preserve Board of Commissioners.

(R. 25, Forest Preserve's 56.1(a) Statement of Facts, Ex. E, Ordinance 4-1-5.)

> No person shall display, distribute, post or fix any placard . . . or
> any other writing containing advertising matter within any forest
> preserve or upon any of the property of the Forest Preserve Forest
> Preserve.

(*Id.*, Ex. E, Ordinance 3-3-8.)

The Forest Preserve also requires that persons wishing to engage in activities on Forest Preserve property obtain a permit. There are three types of permits available: (1) picnic permits; (2) special use permits; and (3) special activity permits. (R. 24, Forest Preserve's Answer to Am. Compl. ¶ 7.) At issue in this case is the procedure by which a party may obtain a special activity permit. The procedure involves completing a form that requests the applicant's contact information, the date and location for which the permit is sought and a description of the proposed activity. The applicant must pay a nominal permit application fee and provide proof of insurance that will indemnify the Forest Preserve. (R. 32, Pl.'s Resp. to the Forest Preserve's 56.1(a) Statement of Facts, Ex. L, Special Activity Permit Process.) The Forest Preserve Superintendent of Recreation reviews the application and either grants or denies the permit. (*Id.*, Ex. A, Vito Benigno Dep. Tr. at 19, 45.)

The Orland Park regulation was promulgated to reduce visual clutter and congestion for aesthetic and safety reasons. (R. 15, Pl.'s Mot. for Prelim. Inj., Ex. E, Orland Park Sign Regulations § 6-307(A).) The regulation prohibits placing private signs on public property and states, in pertinent part:

> Prohibited Signs. Except as specifically provided otherwise . . . the following signs and displays shall be strictly prohibited throughout the Village:
> . . . .
>
> 3. Signs in public rights-of-way which are not public signs, except for banners on light poles as approved by the Village Board.

(*Id.*, Ex. E, Orland Park Sign Regulation § 6-307(M)(3).)

## LEGAL STANDARDS

Summary judgment is proper only when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view all evidence in a light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party. *Id.* at 255. However, if the evidence is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A court may *sua sponte* grant summary judgment to the non-moving party when there has been a motion for summary judgment but no cross-motion. *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 494 (9th Cir. 2000). Courts may enter summary judgment *sua sponte* as long

6

as the losing party had notice that it had to come forward with all of its evidence and arguments. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). This judicial power furthers the policy goals of Federal Rule of Civil Procedure 56, in that it enables a court to promptly dispose of a case in which there are no genuine issues of material fact. *Exxon Corp. v. St. Paul Fire and Marine Ins. Co.*, 129 F.3d 781, 786 (5th Cir. 1997).

A preliminary injunction will only be granted when the party seeking the injunction demonstrates that: (1) it has a likelihood of success on the merits; (2) it will suffer irreparable harm if the preliminary injunction is denied; (3) there are no adequate remedies at law; (4) the harm that the party will suffer if the preliminary injunction is wrongfully denied is greater than the harm that the opposing party will suffer if the preliminary injunction is wrongfully denied; and (5) granting the injunction will not harm the public interest. *Kiel v. City of Kenosha*, 236 F.3d 814, 816 (7th Cir. 2000); *South/Southwest Assoc. of Realtors, Inc. v. Village of Evergreen Park*, 109 F. Supp. 2d 926, 927 (N.D. Ill. 2000).

## ANALYSIS

### I. Mootness

Although Local 150 has ceased picketing, we find that this case is not moot. Local 150 may choose to resume picketing following an National Labor Relations Board decision that is to be rendered on May 2, 2001 concerning the union's labor dispute with Crystal Tree. (R. 31, Pl.'s Resp. to Orland Park's Statement of Facts ¶¶ 24-26.) An exception to the mootness doctrine exists when the challenged situation is likely to recur, potentially subjecting the complaining party to the same adversity. *Krislov v. Rednour*, 226 F.3d 851, 858 (7th Cir. 2000). In *Krislov*, a political candidate challenged the constitutionality of a state statute that had precluded his name

7

from being listed on election ballots. The court determined that, despite the fact that the election had already taken place, the case was not moot because the candidate had expressed an interest in running for office in the next election. Therefore, the case fell into an exception to the mootness doctrine in that it was "capable of repetition yet evading review." *Id.* Because Local 150 may choose to resume its picketing activities, we believe that this case likewise falls into this exception to the mootness doctrine.

## II. Protected Speech

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Not all speech, however, is equally protected. For example, a government may impose stricter regulations on commercial speech than on non-commercial speech. *See, e.g., Edenfield v. Fane*, 507 U.S. 761 (1993); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). In addition, the term "speech" is not limited to the spoken or written word but also includes expressive conduct and symbolic speech. *See, e.g., Capital Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 770-71 (1995) (Thomas, J., concurring) (Klu Klux Klan's cross is symbolic speech); *Texas v. Johnson*, 491 U.S. 397, 405-06 (1989) (flag-burning is expressive conduct).

As an initial matter, we must determine whether Local 150's picketing activities and its inflatable rat constitute speech that is accorded the full protection of the United States Constitution. The Supreme Court has consistently described peaceful picketing as speech that is protected under the First Amendment. *See, e.g., Va. State Bd.*, 425 U.S. at 762 (in a labor dispute, "it has long been settled that both the employee and the employer are protected by the First Amendment"); *Int'l Bhd. of Teamsters, Local 695 v. Vogt*, 354 U.S. 284 (1957) (peaceful

picketing, including labor picketing, is protected). In fact, the line of cases according First Amendment protection to labor picketing can be traced back to 1940. *See, e.g., Thornhill v. Alabama*, 310 U.S. 88 (1940). Moreover, the Supreme Court has held that picketing is not only protected speech, but must also be considered non-commercial speech. *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const.*, 485 U.S. 568, 576 (1988) (stating that "speech regarding labor disputes is *not* commercial speech") (emphasis in original). Thus, we conclude that the peaceful labor picketing engaged in by Local 150 is protected, non-commercial speech that falls within the purview of the First Amendment guarantees.

We reach a similar conclusion with respect to Local 150's use of the inflatable rat. The rat has long been a symbol of labor unrest. *See* The New Shorter Oxford English Dictionary 2480 (4th ed. 1993) (defining "rat" as, *inter alia*, "[a] worker who refuses to join a strike or who takes a striker's place"). We easily conclude that a large inflatable rat is protected, symbolic speech. Therefore, we find that Local 150's use of an inflatable rat to publicize its protest with Crystal Tree falls within the category of protected speech.

### III. Public Forum

Another issue concerns the nature of the properties upon which Local 150 was engaging in its protected, free speech activities. The extent to which a government body may regulate speech varies according to the nature of the forum involved. *See Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 45-46 (1983). Streets and parks are traditional public fora and, as such, the government's right to limit protected activities on them is sharply circumscribed. *Id.* at 45. Local 150 was using Forest Preserve property, and we have no doubt that such property is akin to a public park which is maintained for the use and enjoyment of the

public in general. Likewise, it is undisputed that the Orland Park property upon which Local 150 picketed is a public street. Thus, the properties involved in this matter fall within the category of public fora. We therefore turn to a discussion of permissible government regulations concerning free speech activities engaged in upon public fora.

## IV. Time, Place or Manner Regulations

It is well established that the government may impose restrictions on the time, place or manner of speech even in a public forum. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1029-30 (7th Cir. 2001). These regulations are generally valid if they are: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communicating the information. *Ward*, 491 U.S. at 791 (citation omitted).

To be considered content-neutral, a regulation must not differentiate between different speakers or messages. If neither the language nor the legislative history of the regulation suggests that one party's views may or should be preferred at the expense of another's, the restriction is content-neutral. *White House Vigil for the ERA Comm. v. Clark*, 746 F.2d 1518, 1527 (D.C. Cir. 1984). Even if the rule may incidentally affect one message or speaker more than another, that does not negate the content-neutral status of the regulation so long as the regulation "serves purposes unrelated to the content of [the] expression." *Ward*, 491 U.S. at 791 (citation omitted). The government's purpose is the controlling consideration. *Id.*

A regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (quotation omitted). Substantial government interests include promoting aesthetics, *Members of the City Council of*

*L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 807 (1984), ensuring the smooth flow of pedestrian and street traffic, *Graff v. City of Chicago*, 9 F.3d 1309, 1316 (7th Cir. 1993), and furthering interests that fall within the scope of the government's police powers, *Vincent*, 466 U.S. at 805. Moreover, the regulation need not be the least restrictive method for achieving the government's purpose. *Ward*, 491 U.S. at 799.

Finally, the regulation must leave open ample alternative means of communication. Courts have found this standard to be met when affected parties are able to disseminate their message, even if the remaining avenues for communication may not be as effective or ideal as the one which is restricted by the regulation. *Vincent*, 466 U.S. at 812 (distributing leaflets was an adequate alternative to posting campaign signs). *See also White House Vigil*, 746 F.2d at 1528 (upholding validity of regulation prohibiting staking signs in the ground as demonstrators could instead carry signs and hand out leaflets).

## V. Prior Restraints

Unlike a time, place or manner regulation, a prior restraint is one in which a party must apply to a government body for a permit or license before it can engage in the protected activity. *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552-53 (1975). They enable the government to deny the ability to engage in protected speech in advance of actual expression. *Id.* Prior restraints are presumptively unconstitutional, *Freedman v. Maryland*, 380 U.S. 51, 56 (1965) (citations omitted), because of the likelihood that they will be used as a method of censoring unfavorable speech, *Forsyth County, Ga. v. The Nationalist Movement*, 505 U.S. 123, 131-32 (1992) (citations omitted). To be permissible, a prior restraint has to contain specific, detailed criteria upon which the licensing body must base its decision to grant or deny a permit. *Id.* at 132

11

(citations omitted). It is insufficient for the government body to claim that it uses set criteria; rather, those standards must be incorporated into the regulation or publicized by binding administrative or judicial construction. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988). Without this, any decision to grant or deny a license could be supported by *post hoc* rationalizations or shifting criteria that enable the granting body to engage in censorship with little risk of detection in any particular case. *Id.* at 758. Thus, absent these standards, the decision would be based upon the unbridled discretion of the licensing body, which is likely to be constitutionally impermissible.

In *Freedman*, the Supreme Court set forth specific procedural safeguards to protect an applicant from the "dangers of a censorship system." *Freedman*, 380 U.S. at 58. Under these safeguards: (1) any restraint must be imposed for a specified period of time and must maintain the status quo; (2) the regulation must provide for prompt judicial review; (3) the licensing body must bear the burden of going to court to suppress the speech; and (4) the burden of proof must remain with the government body. *Id.* at 58-60.

When a licensing regulation has specific standards to guide the decision-maker, the regulation will be analyzed under the time, place or manner rules discussed above. *See MacDonald*, 243 F.3d at 1026-30. However, when the regulation grants the government body unfettered discretion to grant or deny a permit, the *Freedman* procedural safeguards must be present. *Freedman*, 380 U.S. at 58-60. Prior restraint regulations may be facially challenged if they can never be applied in a valid manner. *Vincent*, 466 U.S. at 797-98. Thus, if every application creates an "impermissible risk of suppression of ideas," *Forsyth*, 505 U.S. at 129-30 (citation omitted), that regulation is subject to a facial attack by even those who have not applied

12

for or been denied a license. *Lakewood*, 486 U.S. at 755-756 (citation omitted). However, if a regulation does not pose an inherent risk of censoring First Amendment rights, it may be challenged only on an "as applied" basis. *Vincent*, 466 U.S. at 801. Under these circumstances, the validity of the regulation itself is not questioned; rather, the permissibility of its application to the party challenging it is at issue. *Id.* at 802 n.22.

## VI. The Forest Preserve's Ordinances

The Forest Preserve contends that its driving and sign ordinances are valid time, place or manner regulations. Local 150's position, on the other hand, is that, by depriving its members of a place to park their cars, the Forest Preserve is infringing upon the union's constitutionally protected right to engage in picketing. (R. 15, Pl.'s Mot. for Prelim. Inj. ¶¶ 74-76.) Local 150 also argues that the Forest Preserve's enforcement of its sign ordinance interferes with its free speech rights. (*Id.*) We address each ordinance in turn.

### A. Driving Ordinance

Local 150's argument that the Forest Preserve's driving and parking regulations are unconstitutional is without merit because there is no constitutional or statutory right to park one's car wherever one wants. *Minx v. Village of Flossmoor*, 724 F. Supp. 592, 593 (N.D. Ill. 1989) (finding that village prohibition on parking trucks on public streets did not infringe protected liberty or property interest). And while the ability to park close to the picketing site is desirable and may help with the dissemination of Local 150's message, as long as the Forest Preserve's regulation does not impact the union's ability to engage in protected activities, it is a valid ordinance. *See, e.g., Graff*, 9 F.3d at 1316. Moreover, in this case the Forest Preserve had no objection to allowing Local 150's members to park their cars in a Forest Preserve parking lot

several blocks away from the picketing site. (R. 25, Forest Preserve's 56.1(a) Statement of Facts ¶ 13.) As such, Local 150's members were able to park their cars on Forest Preserve property and walk to the picketing site.

Because the Forest Preserve's driving ordinance does not attempt to regulate any constitutionally protected activity, there is no need to determine whether it is a valid time, place or manner regulation of constitutionally protected rights.

### B. The Sign Ordinance

The Forest Preserve's sign ordinance prohibits commercial speech, in the form of advertisements, on Forest Preserve property. As such, the sign ordinance attempts to regulate a protected activity and must meet the criteria of the time, place or manner analysis. The ordinance prohibits all commercial advertising. This is not content-neutral because it favors non-commercial speech. However, as discussed above, commercial speech is not entitled to the same degree of protection as non-commercial speech. The Supreme Court has found unconstitutional those regulations that favor commercial speech over non-commercial speech, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), as well as regulations that favor one form of non-commercial speech over another, *id. See also Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972). The inference drawn from these cases is that regulations that favor non-commercial speech will pass constitutional muster. *Ayres v. City of Chicago*, 966 F. Supp. 701 (N.D. Ill. 1997) (regulation prohibiting peddling of merchandise at City-sponsored events was content-neutral). Therefore, the first prong of the time, place or manner analysis is satisfied insofar as the sign ordinance merely imposes greater restrictions on commercial over non-commercial speech.

The ordinance enables the Forest Preserve to maintain the aesthetic value of its property.

14

As noted above, advancing aesthetic values is deemed to be a substantial government interest. Moreover, because the problem that the ordinance is attempting to alleviate, *i.e.* reducing visual clutter and maintaining the property in a more pristine manner, can only be resolved by eradicating the signs themselves, the ordinance is narrowly tailored to meet the Forest Preserve's objectives. *See Vincent*, 466 U.S. at 810. Therefore, the ordinance meets the second prong of our analysis.

Finally, the sign ordinance leaves open ample alternative means of communication. Presumably, advertisers could pass out leaflets or carry signs on Forest Preserve property. These alternatives have been considered sufficient to satisfy the third prong of the analysis. *Id.* at 812. Thus, the ordinance is a valid time, place or manner regulation.

This finding, however, does not conclude our analysis because although the ordinance is valid, it may not be used to prohibit Local 150's placement of signs and the inflatable rat on Forest Preserve property. On its face, the sign ordinance merely prohibits commercial speech. (R. 7, Forest Preserve's Mot. for Summ. J. ¶ 8.) Because picketing and symbolic speech as represented by the rat constitute non-commercial speech, the ordinance is inapplicable to Local 150's activities and may not be enforced against their protected activities. Therefore, this Court hereby enjoins the Forest Preserve from enforcing its sign ordinance against Local 150's non-commercial and protected picketing and symbolic speech activities.

### C. The Permit Procedure

#### 1. Constitutionality

The Forest Preserve's permit procedure is a licensing scheme that enables the governing body to grant or deny an applicant the use of a public forum. Governments may impose permit

requirements on those wishing to parade, march or rally as a method of regulating competing uses of public fora. *Forsyth*, 505 U.S. at 130. In this case, the Forest Preserve's special activity permit procedure does not have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a substantial risk of censorship. *See Lakewood,* 486 U.S. at 760. The special activity permit regulates the use of Forest Preserve property in sporting events and other activities that are not protected activities and that do not fall within the definition of a picnic (which would require a picnic permit). (R. 32, Pl.'s Resp. to the Forest Preserve's 56.1(a) Statement of Facts, Ex. L, Special Activity Permit Process.) Because not every application of the Forest Preserve's permit procedure infringes on protected constitutional rights, we limit our analysis to the application of the permit procedure to Local 150.

The Forest Preserve's special activity permit procedure requires applicants to complete a form and submit it to the Forest Preserve for approval. Local 150 completed the form in a proper manner and had the requisite insurance to indemnify the Forest Preserve. (R. 30, Pl.'s Resp. to the Forest Preserve's 56.1(a) Statement of Facts ¶ 9.) Although the Forest Preserve contends that its decision to grant or deny a permit is based upon the need to abide by its *raison d'etre* and to protect the health and safety of the public, (R. 19, Forest Preserve's Mot. for Summ. J. ¶ 8), the Forest Preserve Superintendent of Recreation follows no written procedures or policies and, in fact, he has sole discretion to grant or deny an application, (R. 30, Pl.'s 56.1(b)(3)(B) Statement of Facts ¶¶ 8, 12, 16, 20). Moreover, the procedure contains none of the safeguards required by *Freedman* in the absence of explicit criteria. (R. 30, Pl.'s 56.1(b)(3)(B) Statement of Facts ¶ 13.)

In the case at bar, Local 150's application was denied because: (1) the IDOT had an easement on the property and Local 150 needed that agency's permission to use the property,

16

(R. 25, Forest Preserve's Statement of Facts ¶ 15); (2) Local 150's activities would create health and safety problems and harm the flora and fauna on the property, (*id.* ¶ 16); and (3) the area that Local 150 wanted to use was not property for which one could obtain a permit, (*id.* ¶ 18).

Because Local 150 requested and was denied a special activities permit to engage in protected activities, the absence of any formalized standards or procedural safeguards mandated by *Freedman* renders this ordinance unconstitutional as applied to Local 150. The lack of any criteria in the permit application process indicates that the permit may have been denied based upon impermissible criteria. *See Lakewood*, 486 U.S. at 760 (holding that "the Constitution requires that the city establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered").

This case is readily distinguishable from other licensing cases decided by the Seventh Circuit. In *Graff* and *MacDonald*, in which permit procedures were upheld, there were ample written criteria that the licensing agency was required to consider in determining whether to grant or deny a license. *Graff*, 9 F.3d at 1317-18; *MacDonald*, 243 F.3d at 1029. Because of these limits on the government's discretion, the *Graff* Court found that the amount of time provided between the denial of the license and the date when the newsstand operator had to remove the structure, coupled with the ability to appeal the denial to the courts under a common law writ of certiorari, were adequate safeguards. *Graff*, 9 F.3d at 1323-1325. Similarly, the *MacDonald* Court stated that, because of the limits on the government's discretion, the threat of censorship was too remote to require the procedural safeguards set forth in *Freeman*. *MacDonald*, 243 F.3d at 1034-36.

Because there are no established standards upon which the Forest Preserve

Superintendent of Recreation must rely in denying or approving Local 150's permit application, and because the *Freedman* procedural safeguards required in the absence of such standards are not included in the permit procedure, we believe that the procedure is unconstitutional as applied to Local 150. Therefore, we deny the Forest Preserve's motions for summary judgment and to dismiss with respect to its permit procedure.

## 2. Preliminary Injunction

We enjoin the Forest Preserve from further application of its special activity permit procedure, as presently constituted, to Local 150.[1] We find that the conditions for granting an injunction have been satisfied in that: (1) Local 150 has succeeded on the merits; (2) Local 150 has suffered irreparable injury by the infringement of its constitutional rights; and (3) there is no adequate remedy at law for the loss of freedom of speech. First, Local 150 has succeeded on the merits because, as discussed above, the Forest Preserve's permit procedure is unconstitutional in that it lacks any formalized standards or procedural safeguards mandated by *Freedman* to guide the Forest Preserve Superintendent of Recreation. *See Lakewood*, 486 U.S. at 760.

Second, the balancing of harms in this case favors Local 150. Local 150 continues to be harmed by the Forest Preserve's denial of its right to engage in picketing against Crystal Tree, whereas the Forest Preserve has failed to establish that it would be harmed by Local 150's picketing activities. Local 150's constitutionally protected activities do not constitute a breach of peace nor do its activities create a hazard to Forest Preserve property as Local 150 merely seeks a permit to picket on "a grassy area with weeds." (R. 19-1, Forest Preserve's Mot. for Summ. J. at

---

[1] The Forest Preserve remains free to revise its special activity permit procedure in an effort to meet the constitutional requirements outlined in this opinion.

4.) Indeed, "[t]he stronger the likelihood that the plaintiff will win, the less of a showing he need make that the denial of the preliminary injunction would hurt him more than granting it would hurt the defendant." *Planned Parenthood v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998). As such, Local 150 has satisfied the second condition for the grant of a preliminary injunction.

Finally, as the Supreme Court stated in *Elrod v. Burns*, 427 U.S. 347 (1976), "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373-74 (citation omitted). The Forest Preserve's denial of a special activity permit to Local 150 prevented the union from exercising its constitutionally protected rights and clearly constitutes irreparable injury. Thus, Local 150 has satisfied the third and final condition for granting an injunction. Therefore, we enjoin the Forest Preserve from enforcing its permit procedure, as presently constituted, against Local 150.

## VII. Orland Park Sign Ordinance[2]

Initially, we note that Orland Park's sign ordinance is subject to a facial challenge because it includes an exemption "for banners on light poles," (R. 15, Pl.'s Mot. for Prelim. Inj., Ex. E, Orland Park Sign Regulations § 6-307(A)), and thus constitutes a prior restraint. *See Vincent*, 466 U.S. at 798. The ordinance itself dictates that banners be made available to the Orland Park Village Board for approval before they may be placed on public property. There are no standards to guide the Village Board in its decision of whether to grant or deny a banner application. As such, the Village Board has complete discretion. Because the ordinance allows for the exercise of judgment and the formation of an opinion based upon the content of the

---

[2] Local 150 also alleges that Orland Park interfered with its rights by refusing to permit a large number of cars to park on 108th Street. As discussed above, there are no constitutional or statutory rights to parking a car.

19

banner, it poses a significant danger of censorship and abridgment of First Amendment rights. *Forsyth*, 505 U.S. at 133 n.10 (citation omitted). Moreover, the ordinance does not contain the *Freedman* procedural safeguards that might otherwise save it. Therefore, the ordinance as written is unconstitutional on its face.[3]

Although not required for the disposition of this case, we will briefly address the constitutionality of Orland Park's sign ordinance without the banner exemption. Because the ordinance completely prohibits placing private signs on public property, there is no danger of restricting speech based upon a government body's unfettered discretion. Therefore, it is subject to analysis as a time, place or manner regulation.

The first hurdle that the Orland Park sign ordinance must overcome is that it must be content-neutral. We find that this ordinance, absent the banner exemption, meets that standard. It is presumed that regulations that completely prohibit a specific method of speech are content and viewpoint neutral. *Lakewood*, 496 U.S. at 763. Indeed, in *Vincent*, the Supreme Court upheld a statute banning all signs from public property. *Vincent*, 466 U.S. at 817. Local 150 makes much of the fact that Orland Park's ordinance permits public signs, such as traffic signs, to be posted in public rights-of-way. (R. 29, Pl.'s Mot. in Opp'n. to Defs.' Mot. for Summ. J. at 5-8.) Local 150 argues that, because the regulation distinguishes between public and private signs, it forces the individuals enforcing the ordinance to read the signs which, presumably, enables them to discriminate based upon the content of the signs. *Id.* We disagree. There is nothing in the record indicating that any government official permitted a private sign to remain

---

[3] Because we have found that the ordinance is unconstitutional on its face, we do not reach a discussion of its validity "as applied" in the case at bar.

posted on public property based upon the sign's content. Indeed, it is usually very easy to distinguish between public and private signs without actually reading those signs because often the color, size, or shape of public signs indicates their official origin. Thus, we find that Orland Park's sign ordinance, absent the banner exemption, is content-neutral.

Furthermore, the sign ordinance is narrowly tailored to serve a significant government interest. The primary objective of the ordinance is to prevent visual blight and to further the aesthetic values of Orland Park. (R. 31 , Pl.'s Resp. to Orland Park's 56.1(a) Statement of Facts ¶ 37.) This objective serves a significant government interest. *See Vincent*, 466 U.S. at 805 (holding that signs are, in and of themselves, an assault on the aesthetics of a village). As such, the sign ordinance is as narrowly tailored as possible to further the government's interests. *Id.*

Finally, the sign ordinance leaves open ample alternative methods of communication. Here, Local 150 continued to picket with signs and was permitted to drive its rat-mobile up and down the street. Moreover, people remain free under the ordinance to post any signs they choose on private property. Indeed, there are considerably more alternative methods of communication left open by the Orland Park sign ordinance than the Supreme Court found necessary in *Vincent*, where it stated that the ability to leaflet was a suitable alternative to posting signs on public property. *Id.* at 812.

Because the Orland Park sign ordinance, absent the banner exemption, is content-neutral, is narrowly tailored to achieve a significant government interest, and leaves open ample alternative methods of communication, we find that it is a valid time, place or manner regulation. However, the incorporation of the banner exemption into the sign ordinance renders it an impermissible prior restraint and, hence, we find the ordinance unconstitutional. Therefore, we

21

must enjoin the enforcement of the ordinance, as presently constituted, against Local 150.

## CONCLUSION

We deny the Forest Preserve's motion to dismiss it as a defendant. (R. 19-2.) We grant the Forest Preserve's motion for summary judgment as to the validity of its ordinances regulating driving and advertising on Forest Preserve property. (R. 19-1.) However, because the activities that Local 150 wants to engage in are non-commercial, protected activities, the sign ordinance does not apply to Local 150 and may not be enforced against it. (*Id.*) We deny the Forest Preserve's motion for summary judgment as to its special activity permit procedure as applied to Local 150, (*id.*), finding that the instant application was an unconstitutional prior restraint on free speech. Therefore, we grant summary judgment to Local 150, (R. 15-1), enjoining the Forest Preserve from enforcing its permit procedure, as presently constituted, against Local 150.

We deny Orland Park's and the Police Department's joint motion for summary judgment, (R. 22-1), finding the sign ordinance unconstitutional on its face, and grant summary judgment to Local 150, (R. 15-1), enjoining Orland Park and the Police Department from enforcing the sign ordinance, as presently constituted, because it is an unconstitutional prior restraint on speech.

In accordance with this opinion, the Clerk of the Court is directed to enter final judgment on liability, pursuant to Fed. R. Civ. P. 58, in favor of Local 150 and against Defendants.

ENTERED:

Judge Ruben Castillo
United States District Court

**Dated: May 4, 2001**

22